NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0326n.06

Nos. 25-3329/26-3029

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jul 22, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee | ) | UNITED STATES DISTRICT |
|  | ) | COURT FOR THE NORTHERN |
| v. | ) | DISTRICT OF OHIO |
|  | ) |  |
| PAUL SPIVAK, | ) | OPINION |
| Defendant-Appellant. | ) |  |
|  | ) |  |

Before: WHITE, THAPAR, and MATHIS, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** After a jury convicted Defendant-Appellant Paul Spivak of one count of conspiracy to commit securities fraud and two counts of wire fraud, he pleaded guilty to several other counts of conspiracy, securities fraud, and wire fraud, and was sentenced to 210 months of imprisonment. Spivak appeals, arguing that the district court erroneously denied his motions to dismiss the indictment, for judgment of acquittal or alternatively a new trial, and to withdraw his guilty pleas. He also contends that the factual bases for his guilty pleas were inadequate. We AFFIRM.

## I. Background

In 2012, Paul Spivak founded U.S. Lighting Group, Inc. ("USLG"), which initially manufactured LED lightbulbs. In July 2016, Spivak asked Richard Mallion ("Mallion")—who was prohibited from working in the securities industry due to prior securities fraud-related convictions—to help take USLG public through a reverse merger with a publicly traded company. Luxurious Travel Corp. ("LXRT") was identified by Spivak and Mallion as a suitable entity. The

reverse-merger transaction had two parts: (1) the USLG owners—Spivak and another investor named Charles Scott ("Scott")—acquired restricted LXRT (later USLG) shares; and (2) third parties, including Mallion, acquired unrestricted or "free-trading" LXRT (later USLG) shares. Mallion acquired and controlled his shares through HSF Investment Services, Inc. ("HSF"), a company in his wife's name. USLG subsequently expanded its portfolio by acquiring businesses focused on campers and gauges for cars and speed boats.

In June 2019, the SEC served a subpoena on USLG, addressed to Spivak, in connection with an investigation into USLG. In August 2019, the SEC advised Spivak that it was not proceeding with an enforcement action against either him or USLG. It did, however, bring enforcement actions against others, including Mallion for acting as an unlicensed broker and committing securities fraud based on activities related to his sale of restricted and free-trading USLG stock.[1] Mallion consented, without admitting or denying the allegations, to the entry of a final judgment against him.[2]

In 2020 and 2021, undercover federal agents and cooperating witnesses posing as investors contacted Spivak about purchasing USLG stock. Over the course of several months, Spivak and his wife Olga Smirnova ("Smirnova") coordinated purchases of free-trading and restricted USLG stock by undercover agents. For the purchases of free-trading stock, Spivak connected the undercover agents with his affiliates Scott and Forrest Church ("Church").

On June 8, 2021, the government arrested Spivak pursuant to a criminal complaint containing allegations of market manipulation and other securities fraud violations based on his

---

[1] *See* Complaint at 1, 4–9, *SEC v. Mallion*, No. 19-cv-62532 (S.D. Fla. Oct. 10, 2019).

[2] *See* SEC, *Richard Andrew Mallion, SEC Charges Man with Fraud, Unregistered Brokerage Activity, and Unregistered Offering*, Litigation Release No. 24642, https://www.sec.gov/enforcement-litigation/litigation-releases/lr-24642 (last visited July 20, 2026).

actions in 2021. A federal grand jury charged Spivak with one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 for overt acts taking place between February 15, 2021 and around June 7, 2021. The alleged "pump-and-dump" conspiracy involved Spivak arranging for government agents and cooperating witnesses posing as co-conspirators to buy free-trading shares of USLG stock at a lower price from other co-conspirators (including Scott and Church) and then sell the stock on the free market at an inflated price. Some of the profits from these sales were to be sent back to USLG in return for more low-priced stock, which would again be marketed and sold at a higher price. Spivak and others also allegedly coordinated the sale of large blocks of shares with the issuance of favorable press releases and other promotional material about USLG to further manipulate the stock price. The indictment detailed the specific meetings between undercover agents, Spivak, and other co-conspirators, and described consensually recorded calls wherein Spivak and co-conspirators discussed buying and selling USLG shares as part of the scheme.

In September 2021, the government obtained a superseding indictment that added various co-conspirators, including Smirnova, Scott, Church, and Mallion, and expanded the charges to include another count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, based on overt acts between 2016 and 2019, twenty counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5, and twenty-five counts of wire fraud in violation of 18 U.S.C. § 1343. For the added conspiracy count, the indictment alleged that Spivak and co-conspirators set up "call rooms" where unlicensed brokers (called "pirates") cold-called potential investors to persuade them to buy both restricted and free-trading shares of USLG, and that Mallion acquired free-trading shares of USLG and sold some of his shares as part of matched trades timed with purchases of USLG shares by investors on the open market solicited through the

call rooms. The indictment further accused Spivak of helping Mallion liquidate his free-trading shares in return for kickbacks of proceeds to Spivak and USLG. Additionally, it alleged that Spivak and others created and released favorable press releases, which they timed with planned promotions and sales of large blocks of shares to inflate the USLG stock price.

In June 2023, a second superseding indictment ("SSI") added one count of conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(k), one count of false declarations before the court, in violation of 18 U.S.C. § 1623(a), and one count of obstruction of a federal investigation, in violation of 18 U.S.C. § 1519.[3] In the operative SSI, Count 1 relates to the 2016-2019 conspiracy and Count 2 relates to the 2021 conspiracy.

In January 2024, Spivak moved to dismiss Count 1 and its related substantive-fraud charges, arguing that the SSI alleged only that he conspired to commit non-criminal acts and that it otherwise failed to put him on notice of what theory of securities fraud the prosecution would pursue at trial. He moved separately to dismiss Count 2 and its related substantive-fraud charges, contesting the accuracy of the facts in the SSI, arguing that the government entrapped him, and asserting that the SSI did not include sufficient facts to support the substantive securities- and wire-fraud counts. He also moved by separate motion to dismiss two of the three obstruction counts.

The district court denied Spivak's motions to dismiss Counts 1 and 2. It found that, "[r]eading the [SSI] as a whole, and taking the factual allegations and their necessary implications as true," the SSI sufficiently alleged fraud under Count 1 and its substantive counts. R. 327, PID 3216–23. Regarding Count 2 and the related charges, the district court dismissed Spivak's concerns as a "dispute [with] the prosecution's version of the facts" and stated that "the issue of

---

[3] In the interim period between the first and second superseding indictment, four of the eight defendants entered into plea agreements, including Mallion and Church.

entrapment in this case belongs to the jury." *Id.* at PID 3223–32. It also concluded that, "[a]s with Count 1," the facts alleged in the SSI "sufficiently make out violations of the federal securities laws" for Count 2. *Id.* at PID 3233. At the same time, the district court granted Spivak's motion to dismiss the two obstruction counts based on the government's failure to oppose.

Finally, the district court ordered that the trial would "proceed in three stages—*first*, Count 1 and its related fraud charges [the 2016-2019 allegations, also referred to as 'Phase 1']; *second*, Count 2 and its related fraud charges [the 2021 allegations, also referred to as 'Phase 2']; and *third*, Count 49 [the remaining obstruction allegation]." *Id.* at PID 3252–53. Regarding the trial schedule, the district court stated that "[a]fter the jury return[ed] a verdict at each stage, trial on the next charge or group of charges [would] proceed immediately." *Id.* at PID 3252.

The Phase 1 trial began in August 2024.[4] In its opening statement, the government explained that there were "two sides to the [conspiracy] that work together[:]" the free-trading stock side and the restricted-stock side. R. 464, PID 5672. "Without one" side of the scheme, the government argued, "the other can't work." *Id.* The free-trading side of the scheme involved Mallion and Spivak hiring call rooms of unlicensed brokers through an intermediary to solicit buys from potential investors, using "high-pressure sales tactics," to drive-up demand for USLG stock. *Id.* at PID 5672–73. Once a prospective investor was ready to buy, the intermediary would contact Mallion—who the government alleged was holding USLG free-trading stock to sell it and send money back to USLG—so that Mallion could arrange a matching sell order. *Id.* at PID 5673–74. On the restricted-stock side, "yet more salesmen or pirates coordinat[ed] with [Spivak] to pitch yet different investors not on buying on the open market" but on buying restricted stock "directly from

---

[4] Prior to trial, more co-conspirators, including Smirnova, entered into plea agreements. This left only Spivak and Scott.

the company," and at a "steep discount" compared to the price listed on the open market. *Id*. at PID 5674–76, 5692. These salesmen misled investors by concealing that they were receiving a "40 to 50 percent" commission and by lying "about how restricted the restricted stock was." *Id.* at PID 5675. The government argued that the free-trading side of the scheme kept the publicly listed price of USLG securities up, which the restricted-stock salesmen used to convince investors that they were getting a good deal when buying the discounted restricted stock. According to the government, Spivak "coordinate[d]" both sides of the conspiracy and monitored sales and payments to brokers. *Id.* at PID 5672–79.

Over several days, the government called twenty-five witnesses, including Mallion, to testify, and presented other evidence showing that Spivak requested updates on stock sales, asked why brokers' trading volumes were dropping off, and provided wiring instructions to several associates, including Mallion.

Spivak moved for a judgment of acquittal, which the district court denied. After 16 days of trial, the jury convicted Spivak of conspiring to commit securities fraud (Count 1) and two wire-fraud offenses (Counts 27 and 28) but acquitted him of the remaining 19 wire-fraud counts and all 11 securities-fraud counts. Counts 27 and 28 concerned, respectively, a September 30, 2016 wire transfer of $10,000 and an October 4, 2016 wire transfer of $5,000 from Mallion through HSF to USLG.

The district court finished reading the Phase 1 verdict around 4:15 p.m. on September 10, 2024, after which it raised the question of moving on to the next trial phase. Although it stated that "left to [its] own devices, [it would] say let's go," the court recognized "[t]hat's probably not the most realistic thing under the circumstances" and that "everybody probably needs a little bit of time." R. 463, PID 5632. Spivak's counsel responded that "given the verdict," they needed to

determine "what course makes sense, and it may be that we don't go to trial if we can work something out, but I need a little more time to figure that out, and I'll do it as quickly as possible." *Id.* When asked by the district court for a time to start the next day, Spivak's counsel suggested 10:00 a.m.

By the following morning, the parties had agreed that Spivak would plead guilty to the Phase 2 counts in exchange for the government moving to dismiss the Phase 3 counts. At the change-of-plea hearing on September 11, 2024, Spivak stated under oath his intent to plead guilty and waive his trial rights. He confirmed that he was pleading guilty to the Count 2 conspiracy and six related substantive-fraud counts "because [he was] in fact guilty," was doing so "of [his] own free will," and had read and understood the plea agreement. R. 478, PID 8777–78.

On November 4, 2024, Spivak moved for acquittal or, in the alternative, for a new trial under Federal Rules of Criminal Procedure 29 and 33 relating to the Phase 1 trial. He argued that the jury's verdict acquitting him of substantive securities- and wire-fraud offenses involving the restricted stock "gut[ted] the conspiracy" and that, because the government's theory of liability on the two wire-fraud counts was vague, the jury likely convicted him "based on an informational fraud theory" which has been rejected by the Supreme Court. R. 480, PID 9000–15.

On December 2, 2024, Spivak moved to withdraw his guilty pleas. He asserted that he was "making this motion at the earliest point in these proceedings since he ha[d] retained new appellate counsel" who needed to familiarize herself with the case. R. 484, PID 9199–9200. He stated that he had "long asserted and maintained his innocence," and that he was "exhausted" and "buckled momentarily" when he "hastily decided" to plead guilty to avoid another trial. *Id.*

The district court issued an omnibus order denying Spivak's various post-trial motions. The court first addressed Spivak's arguments in his motion for acquittal or a new trial. Because it

found that the Court 1 conspiracy "went beyond restricted stock and commissions" to include "manipulating the price of the free-trading [USLG] stock," the court concluded that, even without the restricted-stock evidence, the elements of the charged conspiracy were satisfied. R. 540, PID 10371. It also found that evidence that Spivak "conspired with others to obtain money from investors by using call centers artificially to inflate the price of USLG stock and that he inquired about and pressured others to push sales of free-trading USLG shares knowing that he could not," together with the two wire transfers detailed in Counts 27 and 28, supported the jury's wire-fraud verdicts. *Id.* at PID 10381.

Regarding Spivak's motion to withdraw his guilty pleas, the district court stated it was denying the motion "for two reasons." *Id.* at PID 10385. First, "based on the record in the present procedural posture, [it] underst[ood] [his] motion as protective" because Spivak was contemporaneously seeking acquittal or a new trial. *Id.* It then "[took] the motion at face value." *Id.* at PID 10386–87. Setting aside Spivak's near three-month delay in seeking relief, the court stated it had "always understood that [Spivak] was prepared to admit to some or all conduct" alleged in the Phase 2 charges and, therefore, concluded that his decision to plead guilty "was not impulsive or the product of momentary weakness following a long and tiring trial." *Id.*

In April 2025, Spivak was sentenced to 60 months of imprisonment on Counts 1 and 2 and 210 months of imprisonment on Counts 20, 22, 27, 28, and 44 through 47, to run concurrently.[5] This appeal followed.

---

[5] Scott proceeded to trial on the Phase 2 counts on September 12, 2024. He was ultimately convicted of Count 2 and one count of securities fraud and was sentenced to two concurrent 42-month terms of imprisonment. Less than four months after he was sentenced, Scott was pardoned by President Trump.

**II. Analysis**

We review de novo the district court's legal conclusions on a motion to dismiss an indictment. *United States v. Grenier*, 513 F.3d 632, 636 (6th Cir. 2008). A denial of a motion for judgment of acquittal is also reviewed de novo. *United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016). Where the sufficiency of the evidence is challenged, we assess "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). This requires us to "draw all reasonable inferences in support of the jury's verdict and . . . reverse a judgment for insufficient evidence only if the judgment is not supported by substantial and competent evidence upon the record as a whole." *Id.* (citation modified). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Lowe*, 795 F.3d 519, 522–23 (6th Cir. 2015) (citation modified).

We review denials of motions for new trial and to withdraw guilty pleas for abuse of discretion. *See United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007); *United States v. Dixon*, 479 F.3d 431, 436 (6th Cir. 2007).

**A. Motion to Dismiss**

Spivak first argues that the district court should have granted his motion to dismiss Counts 27 and 28—the two wire-fraud counts of which the jury found him guilty—because the allegations in the SSI failed to provide him with adequate notice of the bases of the charges.

The Notice Clause of the Sixth Amendment guarantees a criminal defendant's right to be informed of the charges against him. *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 176 (6th Cir. 1992). "A federal indictment must charge each element of the crime, fairly

inform the defendant of the charges, and protect the defendant against double jeopardy." *United States v. Deakins*, 152 F.4th 693, 703 (6th Cir. 2025). Generally, an indictment is sufficient if it charges the offense "in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Hamling v. United States*, 418 U.S. 87, 117 (1974) (citation modified). The statutory language, however, "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense" being charged. *United States v. McAuliffe*, 490 F.3d 526, 531 (6th Cir. 2007) (citation omitted). To charge wire fraud under 18 U.S.C. § 1343, the government must allege facts showing that the defendant devised or willfully participated in a scheme to defraud, used an interstate wire communication to further the scheme, and intended to deprive someone of money or property by means of false or fraudulent pretenses.

Spivak first asserts that the SSI is deficient because "[o]nly two of [it's] 56 pages were dedicated to the 21 counts of wire-fraud before the jury in Phase 1" and those pages did not include a "statement of the facts and circumstances" detailing the offenses with which he was charged. Appellant's Br. at 19–21. Reading the indictment as a whole and construing the allegations "in a practical sense with all of the necessary implications," as we must, the SSI is sufficient. *United States v. Reed*, 77 F.3d 139, 140 n.1 (6th Cir. 1996) (en banc); *see also United States v. Lee*, 919 F.3d 340, 353–54 (6th Cir. 2019).

The pertinent section begins with language incorporating by reference the allegations made earlier in the SSI. Tracking 18 U.S.C. § 1343, the SSI then alleges that Spivak and others "knowingly devised, and intended to devise, a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises." R. 206,

PID 1444. It further alleges that "for the purpose of executing and attempting to execute the foregoing scheme," Spivak "transmitted and caused to be transmitted" electronic transfers of funds. *Id.* at PID 1445. The SSI then lists the counts of alleged wire fraud, including Counts 27 and 28, in a chart that specifies the transaction dates, transfer amounts, originating and receiving banks, and the relevant defendant. *Id.* at PID 1445–46. These details were sufficient to inform Spivak of the specific offenses charged and protect him against double jeopardy. *See Deakins*, 152 F.4th at 704 (finding indictment that tracked the statutory language, listed each element, and "provided factual details on when," "where," and "against whom . . . the offense was committed" constitutionally sufficient); *United States v. Howard*, 947 F.3d 936, 943 (6th Cir. 2020) (same where the indictment alleged, among other things, the means, date, and location of the offense).

Spivak further protests that the SSI failed to contain allegations showing how the wire transfers in Counts 27 and 28 "tie[d] back to any factual allegations found earlier in the SSI." Appellant's Br. at 21. But, by the SSI's plain language, the "foregoing scheme" for the purpose of which the alleged wires were executed incorporated all prior factual allegations. R. 206, PID 1444–45 ("The factual allegations contained in paragraphs 1 through 36 and Counts 1 and 2 are re-alleged and incorporated as though fully set forth herein.").[6]

Finally, according to Spivak, even if the wires related to the incorporated scheme, that scheme did not involve an intent to defraud because investors received exactly what they

---

[6] Spivak asserts that, by failing to raise it below, the government forfeited the argument that the alleged scheme to defraud for Counts 27 and 28 is detailed in allegations incorporated by reference. Although the government did not make the exact "incorporation" argument for Counts 27 and 28 before the district court, it did invoke "the incorporated allegations" in arguing that the substantive securities-fraud cases were properly alleged and that Spivak had sufficient notice. R. 303, PID 2825; *see also* R. 319, PID 3065 (referencing "the factual allegations that are incorporated into" the substantive-fraud counts); *id.* at PID 3066 ("[L]ooking at the incorporated allegations, Paul Spivak is the CEO of the company. He is at the top of this conspiracy as alleged in the indictment."). Though not the model of clarity, this is enough to have preserved the argument for our review. Regardless, we review the sufficiency of an indictment de novo and construe an indictment liberally in favor of its sufficiency. *United States v. Gibson*, 409 F.3d 325, 331 (6th Cir. 2005).

"bargained for: a fungible, free-trading share of USLG" and there are "no allegations that [Spivak] or anyone else misrepresented who 'controlled' the shares." Reply Br. at 3–4. An intent to defraud requires "an intent to deceive or cheat for the purpose of either causing a financial loss to another or bringing about a financial gain to oneself." *McAuliffe*, 490 F.3d at 531 (quoting Sixth Circuit Pattern Jury Instruction 10.01(2)(E)). And an indictment is sufficient "if the facts alleged [therein] warrant the inference" of an intent to defraud. *Id.* at 532. The SSI does more than warrant that inference. It alleges that Spivak, his co-conspirators, and his associates sold free-trading shares to investors "while concealing the truth regarding who controlled those USLG shares" and that Spivak "arranged" for shares "to be held in the names of co-conspirators . . . to avoid restrictions on [his] ability to sell." R. 206, PID 1415–16. It also explicitly recites the relevant statutory language—including that Spivak "knowingly" devised a "scheme" to "defraud" by means of "false and fraudulent" representations—and details the specific wire transactions at issue. *Id.* at 1444–45. And even if we credit Spivak's assertion that investors received exactly what they bargained for, that does not undermine the SSI's sufficiency because the indictment alleged that Spivak participated in manipulating the market of USLG shares. *Kousisis v. United States*, 605 U.S. 114, 124 (2025) ("[A] defendant violates § 1343 by scheming to obtain the victim's money or property, regardless of whether he seeks to leave the victim economically worse off") (citation modified). The district court therefore did not err in denying Spivak's motion to dismiss Counts 27 and 28.[7]

### B. Motion for Judgment of Acquittal

Spivak next contends that the district court erred in denying his motion for acquittal on Counts 27 and 28 (wire fraud) and Count 1 (conspiracy).

---

[7] Spivak initially contested the district court's denial of his motion to dismiss the Phase 2 counts as well but later conceded that his guilty pleas preclude our direct review of that denial.

**1.**

Spivak first asserts that, because there was scant mention of Counts 27 and 28 at trial, the evidence before the jury was insufficient to support his convictions on these counts. Counts 27 and 28 involved payments on September 30, 2016, and October 4, 2016, of $10,000 and $5,000, respectively, from HSF's SunTrust Bank account to USLG's Huntington Bank account. To sustain a conviction for wire fraud, the government must prove "(1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property." *United States v. Prince*, 214 F.3d 740, 747–48 (6th Cir. 2000) (citation modified).

First, the government sufficiently established a scheme to defraud based on Spivak and Mallion's agreement that Mallion would obtain and then sell unrestricted USLG shares as instructed by Spivak in exchange for splitting the proceeds with USLG to artificially inflate the price of USLG shares. With the money he had received from USLG's escrow account in return for his work on the merger, Mallion purchased 1.5 million USLG free-trading shares through the HSF account.[8] According to the evidence presented at trial, after the reverse merger, the plan for USLG was "[t]o create a price in the open market that was significantly higher than what [they] were going to raise the money privately for." R. 464, PID 5794. To do so, Spivak and Mallion were focused on creating supply and demand for USLG stock.

Because Spivak was a company affiliate, he was unable to obtain and sell free-trading shares. Evidence showed, however, that, pursuant to "an agreement with" Spivak, Mallion was

---

[8] Mallion purchased his shares from two individuals who had previously controlled LXRT—the company with which USLG merged—and split the shares into two 750,000 transactions. The first transaction occurred in July 2016. These purchases came after discussions between Mallion and Spivak about how to distribute USLG's post-merger shares, including Spivak offering, and Mallion declining, 35 percent of USLG's restricted stock.

supposed to "liquidate" or "sell . . . into the market" his free-trading shares and send cash back to USLG. R. 471, PID 6625–26. To facilitate the sale of free-trading shares, Mallion, along with another associate, organized "a network of individuals that would solicit people" to buy stock through call centers. R. 464, PID 5796. Although the proceeds of the free-trading stock sales were "initially . . . supposed to go to creating a market and paying expenses," once trading started, Spivak "wanted 50 percent of the proceeds sent back to the company." *Id.* at PID 5804. Because "[t]here was no investor base" for the stock, the purpose of the call rooms was to "brin[g] volume into the stock and hel[p] with price structure." R. 471, PID 6628–29. Mallion testified that the share price generated from the solicited buys of free-trading stock was not a legitimate reflection of USLG's value and that "the market capital of the company was significantly higher than the company was worth," a topic he stated that he discussed with Spivak. R. 465, PID 6098. And the jury heard evidence that Spivak agreed to this arrangement with Mallion despite knowing that Mallion was not allowed to participate in trading or hold free-trading shares due to his securities ban.

Spivak protests that there is nothing fraudulent about using call rooms to sell shares. That is correct as a general statement. However, the underlying fraud here is not the use of call rooms, but rather the solicitation of investors by unregistered brokers (including Mallion, who was banned from the business) for the purpose of USLG's undisclosed enrichment. And although Spivak argues that there is no evidence that Mallion sold free-trading shares on Spivak's behalf, the jury heard testimony that Mallion and Spivak had an agreement that Mallion was "holding all the free-trading" stock in order to "sell it into the market" and then "send[] cash to" USLG. R. 471, PID 6625–26. That USLG, and not Spivak, received the proceeds is irrelevant given Spivak's direct role in orchestrating the scheme and demanding proceeds on USLG's behalf. Moreover, because

-14-

Spivak held a large percentage of USLG's restricted stock, a rational trier of fact could infer that he was benefitting from USLG's receipt of those proceeds.

Spivak additionally takes issue with the district court's statement that "pursuant to an agreement" Spivak and Mallion "exchanged money relating to free-trading shares, which the law precludes." Appellant's Br. at 32 (quoting R. 556, PID 10582). Even if the exchange of money related to the free-trading shares is not generally precluded by law, it runs afoul of the law here given the failure to disclose Spivak's involvement in the sale of free-trading stock, Mallion's ban from the securities business, the use of unregistered brokers, manipulation of the market, and concealed kickback scheme.

That the government adequately established a scheme to defraud is not, however, the end of the inquiry; it must still link the wires to that scheme. Spivak is correct that there was little direct evidence presented regarding the $10,000 and $5,000 wire-fraud transactions in Counts 27 and 28, respectively. The government elicited testimony from an FBI forensic accountant who identified which incoming wire transfers on USLG's Huntington National Bank ledger matched outgoing wire transfers from HSF's SunTrust account of the same amount and, thus, corresponded to Counts 27 and 28. For Count 27, Mallion identified text messages between Laura Loesch ("Loesch"), USLG's bookkeeper, and Smirnova on September 30, 2016—the day of the Count 27 transaction—in which Loesch texted that "[t]he 10 was Richard" which she testified meant that "10,000 must have come in from Richard" "[f]rom a sale." R. 474, PID 7781. Although Loesch could not recall "if it was free-trading or if it was 10,000 that [Mallion] was sending to the company as a result of that," she confirmed that the money "was connected to the sale of stock." *Id.*[9]

---

[9] Spivak counters that there were multiple $10,000 transactions on September 30 and the text messages do not make clear to which Loesch was referring. In addition to a $10,000 "incoming Fedwire transfer," the only other

Regarding Count 28, no direct evidence was presented beyond the identification of the relevant $5,000 wire transfer on USLG's bank ledger.

The government insists that, despite the dearth of direct evidence, the chronology of events leading to the wire transfers and the volume of other evidence sufficiently links Counts 27 and 28 back to the scheme to defraud. According to the government, free-trading through the call-center brokers organized by Mallion began around September 22, 2016, once Mallion's free-trading stock had cleared. As soon as trading began, Spivak demanded that Mallion send half the proceeds back to USLG. Spivak and Loesch closely monitored Mallion's volume of sales to ensure USLG was getting the promised proceeds. Because Loesch understood that "when stocks were sold, H[SF] should have sent some of the proceeds to the company," she routinely texted Mallion to ask if "a wire [was] coming today as promised." R. 474, PID 7847. For example, on September 23, 2016, Loesch asked Mallion when USLG would receive $68,000, which represented "[h]alf of the sum of what the amount of shares that were sold" for two trading days. *Id.* at PID 7845, *see also* R. 464, PID 5850. By October 11, 2016, Loesch confirmed that HSF had wired USLG $52,500.[10]

The wire transactions in Counts 27 and 28 both occurred after free-trading call-center activity began on September 22, 2016.[11] Pursuant to Mallion and Spivak's agreement, this call-center activity was intended to inflate the market price of USLG stock. Mallion and Loesch

---

$10,000 transaction is listed as having been deposited in a "Brch/ATM." R. 647, PID 13189. The jury could infer that Loesch was referring to the $10,000 wire at issue in Count 27.

[10] The record does not specify how many individual sale proceeds make up this total amount. Mallion did not always dutifully send Spivak and Loesch the 50 percent they requested. Despite Spivak and Loesch's demands, Mallion testified there were times when he sold free-trading shares and kept the proceeds for himself. Indeed, Loesch stated that there were "[a]lways" issues with Mallion "sending money that he had promised." R. 474, PID 7784.

[11] The government also points to text messages from late August 2016 between Mallion, Spivak, and Loesch where Spivak asked Loesch to send Mallion "our wiring instructions" because "[h]e has 10K for us." R. 464, PID 5857. Spivak further specified that the money was for "USLG." *Id.* at PID 5858. Mallion testified that "before [he] could even clear the stock to sell it, [Loesch and Spivak] were calling every day asking for money." *Id.* at PID 5827. However, given the government's timeline, it is not clear how this August $10,000 transfer could be proceeds from the free-trading call-center scheme, which did not begin until September.

testified that Spivak expected and demanded that Mallion send USLG half of the proceeds from free-trading stock sales completed through the call-centers. Direct text message evidence links the $10,000 wire transfer to stock sales coordinated by Mallion.

Regarding Count 28, the government identified for the jury an outgoing $5,000 wire transfer on HSF's SunTrust bank account ledger on October 4 and an incoming wire of the same amount on USLG's ledger. Given that this $5,000 wire transfer occurred less than a week after the $10,000 wire transfer and that, one week later, Loesch confirmed that HSF had wired USLG a total of $52,500, a jury could infer that the second wire was also connected to the free-trading call-center activity. And, although only "circumstantial evidence and a chain of inferences" ties the $5,000 wire back to the scheme, *United States v. Garcia*, 758 F.3d 714, 718–19 (6th Cir. 2014), we afford circumstantial and direct evidence the same weight, *see Prince*, 214 F.3d at 746. Ultimately, Spivak "bears a very heavy burden to show that the government's evidence was insufficient." *United States v. Tragas*, 727 F.3d 610, 617 (6th Cir. 2013) (citation modified). On the record before us, we cannot say that "after viewing the evidence in the light most favorable to the prosecution," as we must, no "rational trier of fact could have" connected the wires in Counts 27 and 28 to the scheme to inflate the USLG share price. *Jackson*, 443 U.S. at 319.

Finally, Spivak briefly suggests that the government proposed, and the jury likely convicted on, an "informational" theory of fraud recently found to be legally invalid in *Ciminelli v. United States*, 598 U.S. 306 (2023). Appellant's Br. at 37. In *Ciminelli*, the Supreme Court rejected the Second Circuit's "right-to-control" theory under which the purpose of the fraud was to deprive a person or entity of potentially valuable economic information. 598 U.S. at 314. The Court concluded that this theory did not provide a valid basis for a conviction under the wire-fraud statute. *Id.* at 311–12. But, as the district court correctly concluded, *Ciminelli* is irrelevant because

the object of the fraudulent scheme here was the deprivation of investor money. Although Mallion's misrepresentation of his broker status and his and Spivak's interest in the shares was central to the scheme to solicit sales, the object of the fraud was securing investor money to prop up USLG stock and for direct profit. Nothing in *Ciminelli* precludes a theory of fraud where misrepresentations and omissions are used in a scheme to obtain money. *See* 598 U.S. at 315–16 (stating that the right-to-control theory is invalid because it "treats mere information as the protected interest" and reaffirming that the wire-fraud statute reaches only traditional property interests, including money); *see also Kousisis*, 605 U.S. at 134 ("[A] defendant commits wire fraud only if his scheme aimed to deprive the victim of a traditional property interest," including money) (citation modified).

**2.**

Spivak additionally argues that the district court erred when it denied his motion for judgment of acquittal on the Count 1 conspiracy charge because the jury rejected the restricted-stock portion of the government's two-sided conspiracy theory. And, according to Spivak, evidence adduced at trial was not sufficient to support a conviction of conspiracy on the free-trading side of the scheme alone. To sustain a conspiracy conviction, the government must "prove an agreement between two or more persons to act together in committing an offense, and an overt act in furtherance of the conspiracy." *United States v. Hunt*, 521 F.3d 636, 647 (6th Cir. 2008) (citation modified). "The existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *United States v. Deitz*, 577 F.3d 672, 677 (6th Cir. 2009) (citation modified).

To the extent Spivak argues that his motion for acquittal should have been granted because the jury's acquittals on the restricted-stock substantive charges were inconsistent with its

conviction on the conspiracy charge, that argument fails. "[I]nconsistent verdicts in a criminal case generally are not reviewable," *United States v. Randolph*, 794 F.3d 602, 610 (6th Cir. 2015), because "[i]t is equally possible that the jury, convinced of guilt, properly reached its conclusion on the [conspiracy count], and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the [substantive offenses]," *United States v. Powell*, 469 U.S. 57, 65 (1984). We depart from this general rule only where the jury verdicts "are marked by such inconsistency as to indicate arbitrariness or irrationality" or where "a guilty verdict on one count necessarily excludes a finding of guilt on another." *Randolph*, 794 F.3d at 610–11 (citation modified). Neither exception is present here.

The law is clear that an acquittal on a substantive count does not necessarily undermine a conviction on a conspiracy count because conspiracy is an offense that does not depend on other criminal conduct. *See, e.g.*, *United States v. Saadey*, 393 F.3d 669, 676 (6th Cir. 2005) (stating that a conspiracy charge relates to the unlawful agreement to further a scheme which, if completed, would satisfy the elements of the substantive offense); *Powell*, 469 U.S. at 65 ("[I]nconsistent verdicts—even verdicts that acquit on a predicate offense while convicting on the compound offense—should not necessarily be interpreted as a windfall to the [g]overnment at the defendant's expense"); *Bullock v. United States*, 289 F. 29, 32 (6th Cir. 1923) (finding "no inconsistency between the acquittal of the substantive act and the conviction of conspiracy to commit such offense"). And, although the government framed the conspiracy as "two-sided" with each side necessary to the other, a rational juror could have concluded that, even absent the restricted-stock component, the free-trading side of the scheme constituted a securities-fraud conspiracy. *See United States v. Rowan*, 518 F.2d 685, 689 (6th Cir. 1975) ("A jury is free to render inconsistent verdicts or to employ relevant evidence in convicting on one count that it may seem to have

rejected in acquitting on other counts."). Our sufficiency-of-the-evidence review for one count "should [therefore] be independent of the jury's determination that evidence on another count was insufficient." *Powell*, 469 U.S. at 67.

Second, for the reasons explained above, there was ample evidence that Spivak, Mallion, and other co-conspirators agreed to commit securities and wire fraud related to sales of USLG's free-trading stock. "That satisfies the first element" of conspiracy. *United States v. Faulkenberry*, 614 F.3d 573, 584 (6th Cir. 2010). And to establish an overt act in furtherance of the conspiracy, the government need only prove "that one of the conspirators" committed such an act. *United States v. Kraig*, 99 F.3d 1361, 1368 (6th Cir. 1996). As the district court correctly highlighted, the jury was presented with evidence that at least one other associate, Church, conspired with Spivak to inflate USLG's stock price by making regular, timed purchases of USLG free-trading stock.

Church testified that, at critical points and to prevent USLG's stock price from falling, Spivak asked him to buy free-trading shares to help create "the perception . . . that the stock is stable and strong," thereby encouraging more people "to buy into the company." R. 475, PID 8207.[12] Church affirmed that his stock purchases were done at Spivak's direction, stating "I was told I was on the team, and if you're on the team, you do what you can to help the team." *Id.* at PID 8212. Church communicated with unregistered brokers in the call centers about marketing and "propping up the stock price." *Id.* at PID 8231. And he testified that, at one point, he and Spivak discussed getting rid of the unregistered brokers organized by Mallion altogether and, instead, creating a comparable "phone bank" operation to target investors. *Id.* at PID 8230–31. After Spivak and Mallion later reconciled, Church entered into an "unwritten agreement" with

---

[12] According to Church, Spivak made this request because he was suspicious that Mallion was dumping USLG stock in violation of his deal with Spivak to "promot[e]" and "sel[l]" the stock to keep "prices up with the free-trading shares that he was given on the front end of the [reverse merger] deal." R. 475, PID 8203–10.

Spivak and Mallion to buy substantially discounted free-trading stock from USLG to keep the stock price up. *Id.* at PID 8249. Church was expected to hold a third of these shares, to reinvest another third in USLG through the purchase of restricted shares, and to sell the final third on the free market through Mallion. Although Church purchased this stock with the understanding that he would be paid back for the first $50,000 that he had invested, he testified that it became clear this was "not a functional arrangement" because it was more important for Spivak and the company to continue paying Mallion "his cut" for marketing and selling free-trading stock, including the stock held by Church. *Id.* at PID 8255–58. According to Church, Spivak explained that USLG benefited from Mallion's "market[ing] the [free-trading] stock" and keeping the price up because it "allowed the company to market restricted shares." *Id.* at PID 8256. A reasonable juror could credit this testimony, as well as the other evidence presented at trial, to find that Spivak conspired with others to manipulate USLG's stock trading price.

Additionally, Spivak agreed with Mallion to receive proceeds from Mallion's sales of free-trading stock even though he knew Mallion was banned from the business. In fact, he demanded those proceeds. Spivak also knew that Mallion was using a fake name to contact prospective investors in USLG. So a reasonable juror could also find that he agreed to a scheme connected with the sale of stock that would operate as a fraud upon purchasers, which constitutes securities fraud. *See Faulkenberry*, 614 F.3d at 583.[13]

---

[13] In the alternative, Spivak's argues that the court abused its discretion in denying his motion for a new trial under Rule 33, which permits a district court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Spivak specifically takes issue with the brevity of the court's analysis. "The appropriateness of brevity or length, conciseness or detail, when to write, what to say, depends upon circumstances." *Rita v. United States*, 551 U.S. 338, 356 (2007). The circumstances here do not demand more than what the district court said. The district court reached its conclusion after over ten pages of analysis of Spivak's arguments in his motion for an acquittal—the same arguments supporting his motion for a new trial. And it based its decision on "its experience hearing the evidence while presiding at trial and its post-trial review of the record." R. 540, PID 10383. Because the district court thoroughly analyzed the substance of Spivak's arguments in the same order, it did not abuse its discretion in relying on that context for its denial of his motion for a new trial.

**C. Guilty Pleas**

Finally, Spivak asserts that he should have been allowed to withdraw his guilty pleas to the Phase 2 charges and that the district court's order finding otherwise was an abuse of discretion.[14] He alternatively argues that his guilty pleas should be vacated because they are not supported by an adequate factual basis.

**1.**

Federal Rule of Criminal Procedure 11(d)(2)(B) allows a defendant to withdraw a guilty plea after its acceptance by the trial court and before sentencing if he "can show a fair and just reason for requesting the withdrawal." The purpose of this Rule is "to allow a hastily entered plea made with unsure heart and confused mind to be undone, not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes he made a bad choice in pleading guilty." *United States v. Walden*, 625 F.3d 961, 965 (6th Cir. 2010) (citation modified). The burden is on the defendant to present proper grounds for granting the motion. *United States v. Bazzi,* 94 F.3d 1025, 1027 (6th Cir. 1996) (per curiam). And the withdrawal of a guilty plea prior to sentencing "is not an absolute right but is a matter within" the district court's broad discretion. *United States v. Spencer*, 836 F.2d 236, 238 (6th Cir. 1987).

In *United States v. Bashara,* we set forth seven non-exclusive factors for a court to consider when determining whether to permit a defendant to withdraw a guilty plea: (1) the amount of time that elapsed between the plea and the motion to withdraw; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant

---

[14] Spivak also challenges the district court's "first" reason for denial based on its perception that the motion to withdraw guilty pleas was "protective" and, therefore, "ha[d] less practical consequence." R. 540, PID 10385. We agree that the district court's reasoning is confusing and likely erroneous but, because we discern no error in the district court's independent conclusion that Spivak's motion failed to warrant relief, any error it made in construing the motion as "protective" was harmless.

has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; 5) the defendant's nature and background; (6) the degree to which the defendant has had prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted. 27 F.3d 1174, 1181 (6th Cir. 1994), *abrogated on other grounds by statute as recognized in United States v. Caseslorente*, 220 F.3d 727, 734–35 (6th Cir. 2000). No one factor is controlling, and each factor's relevance varies "according to the circumstances surrounding the original entrance of the plea as well as the motion to withdraw." *United States v. Haygood,* 549 F.3d 1049, 1052 (6th Cir. 2008) (citation omitted).

The district court did not abuse its discretion in concluding that the factors favored denying Spivak's motion to withdraw his guilty pleas. First, nearly three months elapsed between when Spivak entered his guilty pleas and when he moved to withdraw them. Although it recognized that the untimeliness of Spivak's motion would "[o]rdinarily" weigh against him, the district court disregarded the motion's timing because it credited Spivak's explanation that the delay was due to a change in counsel "made in good faith and not for purposes of delay." R. 540, PID 10385–86.

On appeal, Spivak argues that his motion's timing and the reason for delay cut in his favor. He claims that he contacted a new attorney "immediately" after pleading guilty and, therefore, "the gap between [his] guilty plea[s] and his change of heart was miniscule." Appellant's Br. at 46–47. And he attributes the delay in filing to new counsel's need to get admitted before the district court and to familiarize herself with the case. We have, however, consistently found delays of this length and shorter to be excessive. *See, e.g., United States v. Benton*, 639 F.3d 723, 727 (6th Cir. 2011) ("This Court has declined to allow plea withdrawal when intervening time periods were as brief as one month"); *United States v. Valdez*, 362 F.3d 903, 913 (6th Cir. 2004) ("[an] unjustified 75-day delay, alone, supported the court's denial of a motion to withdraw"); *United States v.*

*Goldberg*, 862 F.2d 101, 104 (6th Cir. 1988) (affirming denial where defendant delayed 55 days and only sought to withdraw his plea after the completion of the trial of a co-defendant which the defendant had avoided by pleading guilty). And we have affirmed denials of motions to withdraw filed after lengthy delays even where there was an indication that counsel may have caused the delay. *See, e.g.*, *United States v. Catchings*, 708 F.3d 710, 718 (6th Cir. 2013) (finding no excuse for two-month delay where there was "some indication" that the defendant "might not have caused the delay" because "we [were] not convinced that he was unable to express his intention to withdraw his guilty plea prior to being permitted to proceed pro se"); *Benton*, 639 F.3d at 727–28 (same for 93-day delay based on counsel's need "to review the circumstances" of a newly released Supreme Court case and "perform research"). Given the thrust of the case law, the district court did not abuse its discretion in considering the timing and reason-for-delay factors neutral in its analysis.[15]

The other factors work against Spivak. Spivak admitted his guilt at the plea hearing and did not protest his innocence prior to his motion to withdraw. He has therefore "not consistently maintain[ed] his innocence" for purposes of the relevant *Bashara* factor. *United States v. Griffing*, 86 F.3d 1156 (6th Cir. 1996) (table). And, although Spivak claims that he was under enormous

---

[15] Spivak raises several cases in opposition, none binding and all distinguishable. *Bell v. Johnson*, 308 F.3d 594, 611 (6th Cir. 2002) ("It is well-established law in this circuit that unpublished cases are not binding precedent"); *Keene Group, Inc. v. City of Cincinnati*, 998 F.3d 306, 315 (6th Cir. 2021) ("As with unpublished decisions, out-of-circuit cases are not binding"). The in-circuit cases all involved circumstances where the delay was due in part to either counsel's refusal to file a motion to withdraw the guilty plea or counsel's prolonged attempt to withdraw representation. *See United States v. Willis*, 2024 WL 5156301, at *5–6 (6th Cir. Dec. 18, 2024) (excusing delay when the defendant had told his attorney he wanted to withdraw his guilty plea eight days after the guilty plea); *United States v. Carter*, 2018 WL 4203786, at *2–3 (W.D. Ky. Aug. 31, 2018) (same for 310-day delay caused in part by a breakdown in communication between defendant and counsel); *United States v. Osborne*, 565 F. Supp. 2d 927, 933–34 (E.D. Tenn. 2008) (same for 133-day delay because evidence showed that the defendant may have asked prior counsel to file a motion to withdraw his guilty plea as early as two weeks after the plea was entered). And the out-of-circuit cases found withdrawal appropriate either because the "plea was made under some mistake or misapprehension," *United States v. Valmont*, 2025 WL 1533016, at *2 (M.D. Fla. Mar. 28, 2025), or the delay was due to mutually agreed-upon sentencing continuances, *United States v. Ortega-Ascanio*, 376 F.3d 879, 886 (9th Cir. 2004).

pressure from "the clock, court, and counsel" to plead guilty, the circumstances underlying the entry of his guilty plea indicate otherwise. Appellant's Br. at 49. True, the district court said that it would ideally start the Phase 2 trial immediately, but it acknowledged that this was "probably not the most realistic" way to proceed. R. 463, PID 5632–33. When Spivak's trial counsel requested time to determine next steps, including if they could "work something out" to avoid trial, the district court asked when the defense would like to "move on to the next phase." *Id.* It was trial counsel, not the court, who suggested the 10:00 a.m. start time. Although it would have been preferable to allow the parties more than an evening to discuss and review the proposed plea agreement, Spivak testified at his change-of-plea hearing that he had the opportunity to, and did, review his pleas before formally entering them. He confirmed that he had sufficient time to speak with his lawyer, ask any questions, consider his advice, and that he was satisfied with counsel's representation. And he "expressed no confusion and affirmed his understanding of the agreement." *United States v. Martin*, 668 F.3d 787, 796 (6th Cir. 2012).

Spivak's personal characteristics further indicate that he was "capable of understanding the consequences of his guilty plea." *Catchings*, 708 F.3d at 719. Spivak is a college-educated, self-described inventor and entrepreneur. We have considered defendants with fewer years of education competent to understand the ramifications of a guilty plea. *See, e.g.*, *Martin*, 668 F.3d at 796 (finding defendant with "some high school education [who] speaks English" and "affirmed his understanding of the [plea] proceedings" could understand the proceedings). And although Spivak has limited first-hand knowledge of the criminal justice system, no one factor is controlling and therefore "a favorable finding with respect to this factor cannot weigh heavily in [his] favor." *United States v. Ellis*, 470 F.3d 275, 285 (6th Cir. 2006).

Because Spivak has not shown cause to withdraw his guilty pleas, we need not reach the final factor. *Spencer*, 836 F.2d at 240 ("[T]he government is not required to establish prejudice that would result from a plea withdrawal, unless and until the defendant advances and establishes a fair and just reason for allowing the withdrawal."). In sum, the district court did not abuse its discretion in denying Spivak's motion to withdraw his guilty pleas.[16]

**2.**

Spivak alternatively argues that his guilty pleas should be vacated because they are unsupported by adequate factual bases. Because Spivak did not raise this issue below, we review for plain error. *United States v. Mobley*, 618 F.3d 539, 544 (6th Cir. 2010). To succeed, Spivak must show an "(1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Pitts*, 997 F.3d 688, 697 (6th Cir. 2021). If Spivak meets these conditions, we "may exercise [our] discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or reputation of judicial proceedings." *Id.* (citation modified).

Under Federal Rule of Criminal Procedure 11(b)(3), before the district court enters judgment on a defendant's guilty plea, it "must determine that there is a factual basis for the plea." Fed. R. Crim. P. 11(b)(3). Ideally, the district court will "ask the defendant to state, in [his] own words, what [he] did that he believes constitutes the crime to which he is pleading guilty." *United States v. Tunning*, 69 F.3d 107, 112 (6th Cir. 1995). But "an on-the-record colloquy with the defendant" is not required. *United States v. Short*, 128 F.4th 823, 826 (6th Cir. 2025). The court may rely on on-the-record statements from the prosecutors and the defendant, witness testimony,

---

[16] Outside of the traditional *Bashara* factors, Spivak also asks us to consider that his "change-of-plea occurred in the context of the [d]istrict [c]ourt's erroneous rulings" on his motions to dismiss both the Phase 1 and Phase 2 counts. Appellant's Br. at 54. But, as discussed, we discern no error in the district court's denial of Spivak's motion to dismiss the Phase 1 counts, and the motion to dismiss the Phase 2 counts is not directly reviewable.

and record documents, including the presentence report ("PSR") and indictment. *Pitts*, 997 F.3d at 698. Ultimately, "[t]he district court need[s] only 'some evidence,' not necessarily 'strong evidence,' that the defendant committed the offense." *Short*, 128 F.4th at 826 (quoting *Mobley*, 618 F.3d at 547).

There is at least "some evidence" to support Spivak's pleas. Although Spivak did not provide a colloquy at the change-of-plea hearing, he affirmatively agreed with the prosecutor's summary of the offenses and their factual bases. For Count 2 (conspiracy), the prosecutor described a scheme in which Spivak and others sought "to obtain investor monies" through the purchase of USLG stock "while paying undisclosed commissions in order to enrich" themselves. R. 478, PID 8776. For Counts 20 and 22 (securities fraud), the prosecutor stated that Spivak caused a confidential source to purchase USLG shares from co-conspirators in April 2021. And, for Counts 44 to 47 (wire fraud), the prosecutor provided the date, number of shares, and individuals involved in each wire transaction.

Spivak also initialed each page of the plea agreement and its factual-basis addendum. He thereby agreed that he was part of a conspiracy that "sought to artificially inflate the share price of USLG," involved the payment of "commissions to an unregistered stock broker for selling shares of USLG to investors, including for selling shares held by Scott and Church," relied on "a concealed agreement that Scott and Church would share the proceeds of [the] sale[s] with USLG and Spivak," and included "a fraudulent consulting agreement" to conceal who was actually being paid for services. R. 590, PID 11863–64. For the securities-fraud counts, Spivak agreed that he used "decepti[on]" and "act[ed] with intent to defraud" in connection with the two specific purchases of USLG stock. *Id.* at PID 11864. And for the wire-fraud counts, Spivak agreed that he participated in the "scheme to defraud in order to obtain money" by causing the two stock

purchases and two interstate wire transactions. *Id.* at PID 11865. This is a sufficient factual basis for Spivak's pleas. *See United States v. Baez*, 87 F.3d 805, 810 (6th Cir. 1996) ("when a plea agreement's written description of the essential facts underlying the charge supports a finding of guilty, the defendant's express acknowledgement of the accuracy of that agreement's provisions satisfies" Rule 11).

Spivak counters that, for the conspiracy and securities-fraud counts, neither the factual-basis addendum nor the change-of-plea hearing transcript includes facts showing that the failure to disclose commissions was a "material" or "misleading" omission. Reply Br. at 23–24. An omitted fact is material if there is a substantial likelihood that it would have "assumed actual significance in the deliberations of the reasonable [investor]." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). The record sufficiently establishes materiality for the substantive securities fraud counts. The plea addendum describes the concealed commissions as part of a scheme to artificially inflate USLG's share price, Spivak's arrangement with an undercover agent and confidential source to purchase stock from USLG to sell for USLG's benefit, and the specific dates on which these purchases occurred. And it details specific instances where the omission of information about commissions was relevant to a government source's purchase of shares of USLG stock. The PSR additionally recounts discussions between Spivak and co-conspirators about issuing USLG stock to insiders "as [a] means of paying the commission on the sale" and "conceal[ing] the true purpose of issuing that stock from the investors." R. 566, PID 10630–31.

The record also includes sufficient facts establishing a scheme to defraud for the wire-fraud counts. "A scheme to defraud is any plan or course of action by which someone intends to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *Faulkenberry*, 614 F.3d at 581. The plea addendum states that the wire-fraud

transactions were executed in support of the "for[e]going scheme" described in full in the conspiracy charge. R. 590, PID 11865 ("Defendant knowingly participated in the for[e]going scheme to defraud"). Though Spivak argues that the record contains no facts linking the wire transfers to that scheme, a wire communication that is "incident to an essential part of the scheme" satisfies the elements of a wire-fraud offense. *Pereira v. United States*, 347 U.S. 1, 8 (1954). The record shows that the wire-fraud transactions here fit this description—the plea addendum states that Spivak "caused" the purchase of USLG shares using wires in furtherance of the conspiracy. R. 590, PID 11865. We therefore discern no clear and obvious error in the district court's acceptance of Spivak's guilty pleas.

## III.

For the reasons set out above, we affirm.